Good morning, Your Honors. May it please the Court, Gregory Dion, Deputy County Counsel, appearing on behalf of the Sonoma County Fire Chief. I believe that this case sets forth a set of very unique facts, and I would like to at least highlight a few of those before I get into the specific cases. There's no dispute that there's no fire department on site at the rancheria. There's no dispute that local officials, Sonoma County Fire Chief, Geislerville Fire District, other officials will have to respond to a fire emergency. There's also no dispute. Do you say they have to? Does the statute require it? Yes, Your Honor, it does. What's the statute and what's it say? It's the Health and Safety Code section. I believe it's 13. I apologize, Your Honor. It's actually several statutes read together. 13-146, 13-143, 13-142, 13-872, 13-872.5. And each of those statutes mandate that the fire chief responds to an emergency. And that's set forth in the Attorney General procedure. And whether it's in his territory or not? It's within the State, Your Honor. And so within the geographical jurisdiction of the Sonoma County, yes, they would have to respond. And they also have to respond pursuant to mutual aid agreements as well. So whether or not they ---- Mutual aid agreements raise a different question. That's an agreement entered into by the county. So presumably the county could make a condition of the mutual aid agreement saying, look, we're not going to take on this obligation unless you satisfy these various concerns that we have about access. In practice ---- So I want to be very clear that there are two different sources of obligation. And I think the agreement source of obligation is somewhat different than the statutory one that you've alleged. Well, actually, I would disagree with that in this sense, Your Honor. The mutual aid agreements are with the State of California, with other jurisdictions. It's not with the Rancheria itself. And so it's usually a standard type agreement that all of the fire districts are signing on to. So they're going to respond. Didn't the Rancheria have a contract with the Geyserville Fire Department to respond in case of fires? Eventually they did enter into a memorandum of understanding to provide services to the Rancheria. But the Geyserville Fire District is a first responder. That's the first issue. They can call upon other districts through mutual aid. But into more significant issues such as hazardous materials responses, Geyserville would defer to the Sonoma County Fire Chief and his officials. In fact, that has already occurred within the past two years. Geyserville went up for an emergency, first responder. Saw what appeared to be a potential hazardous materials concern or incident, and they called upon the Sonoma County fire officials who did respond. It eventually turned out to be nothing, but they did respond. Now, in regards to the fact that there is no on-site fire department and Sonoma County officials or other officials are going to have to respond to an emergency because they have that duty, that responsibility, with it comes certain rights and even obligations. Well, again, the responsibility is one you're saying is imposed by State of California statute. State of California is a sovereign, but the Rancheria is a sovereign as well. And is there anything, any action on the part of the Rancheria which obligates response by the part of the county? I'm not sure. Basically, what I'm saying here is you're arguing to us that the State of California has passed statutes imposing an obligation upon the fire chief, which justifies the fire chief imposing his authorities to some degree over this territory. You're saying, well, the State of California doesn't have itself authority over this territory. I'm not sure its statutes can give that. And if you look at the compact between the Rancheria and, let's say Dry Creek, it's easier, between Dry Creek and the State, it is explicit in saying that nothing here is going to provide jurisdiction over to the county to enforce building and safety codes. Well, so now we're here and you're telling us things the State has done someplace else somehow gives this authority to the county. And it seems to me that's in just kind of stark contrast with what the compact provides. How can that be? Well, a couple of things. First, looking at the cases, whether it's Cabazon or Quichon or, and I apologize, one additional case I came across recently, which is the State of Nevada versus Hicks matter, dealing with an inspection war, all state that the jurisdictional or the sovereignty of the State does not end at the border with the Rancheria.  It's owned State sovereignty to assert beyond the border with the Rancheria. So that's the first issue of what is the compelling interest. In regards to the compact itself, the compact simply says it does not confer jurisdiction on the county. It does not say that the Rancheria, however, is going to take care of all fire safety, it's going to take care of all responses. That question actually is left unanswered by the compact. And the argument that we've made is you first determine what statutes are at issue here, fire codes, a significant compelling public policy issue for the State of California. And from there, does the compact limit it in any way? Yes, there's an issue regarding whether it's a uniform building code or whether it's the California fire code or whether it's the Sonoma County fire code. That may limit it as to our ability of what we're going to enforce. But you begin first with the public, the fundamental public policy, which is you need to have fire safety within all of the jurisdictional area of the State of California, including the Rancheria. What makes this different than the arguments that were raised in Gobin of exceptional circumstances, which the Court didn't allow? Well, keep in mind, first of all, Gobin was not the State of California. It was the State of Washington. It also dealt with a wide range of issues, such as sewer, water, endangered species. They never addressed fire codes. If you look at that case, they don't address fire codes at all. They simply lump in health and safety codes as a general statement. But there's no discussion on fire codes. Gobin never looked at fire codes. And with that said, I think the State of California has elevated fire codes to be more of a significant issue than building codes. And the reason I say that, I think there's two sources for that. First, in regards to peace officers. And we cited to, I believe it's health and safety code 13872.5 and 13872.0. In regards to the fact that fire chiefs are designated as peace officers. And if you look at Penal Code Section 830 that has a list of all the persons in the State that have been listed as peace officers, it includes the fire chiefs. It doesn't include building inspectors. The tribe, even though the compact allows them to enforce some of the building codes, it does not allow them to raise it to criminal prosecution. They don't have that same status. Yet the State of California has recognized building code violations may not raise to a criminal level where there needs to be a criminal citation. But in fire codes, that's a different issue. And that's why they've deputized fire officials, local fire officials, as peace officers. Then, also, I think there's a second evidence of the fact that fire codes are dealt differently in the State of California. I cited to People v. Rhodes, which is a State court action. And there, the State court is even saying, fire codes are of a significant concern that we should be able to enforce those on tribal properties, such as the rancheria in this case. With that said. Now, let me ask this. Has some type of mediation been attempted in this case? You know, we've got dual concerns here. We have the important concepts and principles of sovereignty for the tribe. And we have real concerns about fires, particularly in California. It seems that there ought to be some common meeting ground. Has that been attempted? Yes, several times, Your Honor. I obviously can't get into the specifics of the mediations. But even with regards to the district court case, the district court judge referred us to a magistrate. We did have a mediation that Mr. Lawrence and I attended, along with the fire chief and fire officials for the tribe. We've had other meetings. And there are also a number of other issues besides fire code safety that compels Sonoma County and the tribe to really discuss other issues. So there have been attempts. The problem is, again, without getting into the specifics of the mediations, is that the fire chief has to have the ability to inspect without restrictions. And that is a major concern for the local fire chief. He has to be prepared to know what's up there. Sonoma County, patrons of the tribe's casino, residents who live next door, the other local fire officials who are responding, all have an expectation that the Sonoma County fire chief knows how to respond to this fire, knows or is prepared to respond to an incident. And to be prepared, you need to have the information. You have to have the ability to inspect. There was a concern raised that Sonoma County was proposing to shut down the one road going to the casino, and that, I don't know if it was said directly, but at least implied it was pretextual as a way to shut down the casino operations. Is part of what the chief is looking for is to shut down that access road? Absolutely not. There is a concern that this road is not safe. That may lead to some result where either additional corrections will have to be made or a second access road will have to be built. Yes, the worst case scenario, yes, the road may have to be closed because you need to have a safe access. That could be the worst case scenario. However, there still could be other avenues. I think this actually highlights a significant issue that may have been overlooked by the district court. And what was before the superior court and what was before the district court was a request for an inspection. We're actually asking for a very limited remedy here. We hadn't gotten even to the issue of what violations. There were two criminal citations issued, but we hadn't even had an opportunity to confirm that or to go up and do a further inspection. What was before the district court was actually a very narrow issue? Does the superior court have the right to hold a hearing, to hear evidence and issue an inspection warrant? The ability to just inspect the casino and inspect the public road, BIA 93, that alone is an important issue to the Sonoma County fire chief. At least he'll have the information. That's an important issue to Dry Creek as well. Yes. And so they contested that, and that explains why we're here. I mean, I understand where the fire chief may be coming from, but I also understand where the ranchery is coming from. The rancheria tells us there, in fact, have been inspections. The State has taken responsibility for it. The State has announced it's in compliance as the fire chief consulted with the State inspector. Yes. And actually, I think that's an important issue. When you look at the testimony, the declaration by Liz Dorone, who was the chairperson, the former chairperson for the tribe, there's no evidence that's put forward by the State or by Guidesville through a declaration or other evidence or reports. What it is is her statement saying, I am informed and believe that the State doesn't have a problem here. I am informed and believe that Guidesville doesn't have a problem here. I'm paraphrasing. But that is basically the evidence. There really isn't any direct evidence from the State of California. When we have had discussions with the State of California, they've taken the position that this is all part of the dispute or resolution process with the tribe and that all the documentation is confidential. We actually had to serve a Public Records Act request on the State of California to get some of this information. Now, that seems crazy to us, is that the local fire chief has to respond to this information, yet the State of California has taken the position that most of this information is confidential. Getting to the specific cases, looking at Cabazon. Cabazon says there's no per se rule that precludes or per se rule that precludes the State from asserting some jurisdiction on the tribe or tribal members. And looking at the Doe v. Mann case that was cited in the briefs, you need to look at what is the public policy behind the activity and the conduct. What is the public policy that you're trying to administer? What is so important? And here, there may not be a bright line. It is a tough case. There's not a bright line like in Keyshawn where there's fireworks and there's a civic statute that says fireworks are prohibited. But there is a significant public policy here. Now, looking at- How does that differentiate from any other regulatory or civil code type provision that provides for building inspections? Presumably there's a public policy behind that, too, and yet the Supreme Court has sorted out regulatory on one side and criminal or prohibitory on the other. So public policy by itself can't be the answer. Well, you still need to look at the statutes involved. And again, I don't disagree about the building codes. I believe the State of California has elevated fire codes in a different class from building codes just by the fact that they've designated fire chiefs and fire officials to have peace officer rights where a building inspector doesn't have that. I also think that you need to look at the type of the codes that we're looking at and the facility we're looking at. There are code sections under the fire regulations that deal with, say, residential properties. For example, you don't necessarily have to have a fire sprinkler in a residential building. That has now been ‑‑ it's changing over time. Local officials, local counties can pass ordinances and require fire sprinklers in residential buildings. But in regards to commercial buildings, it's mandated. In regards to commercial buildings, you have to have access to those. You have to have fire hydrants. Excuse me. Just getting back to your peace officer point, I know that fire chiefs and their deputies are able to enforce the criminal arson laws. Are there criminal aspects to the building code related to fire prevention? Yeah. Under 13‑‑ I keep saying 18. 13.871.72, it talks about a violation of a fire code can be prosecuted as a misdemeanor. And criminal citations were issued in this case. They weren't prosecuted. What happened was we received a letter after trying to make contact with a tribe. They wanted to do a further inspection. And they said, no, you don't have jurisdiction. You can't do an inspection. We decided, or our fire chief decided, not to proceed with the citations at that point, but to deal with the issue of do we have a right to do an inspection. So, again, what we asked of the superior court, and when we got to the district court, was actually a very narrow issue. Do we have the right to do an inspection? That minimum request. The other cases that were cited in the briefs, I think we need to highlight it here, is Cabazon, Keishon, and People Vs. Road all dealt with the fact that you need to look at the public policy. And only Keishon, it's the only NYSERC case I know, has dealt with fire codes. Even Gobin didn't deal with fire codes. Your Honor, I know we only have a few minutes left, and I'd like to reserve that for rebuttal. Okay. Thank you. Good morning, Your Honors. May it please the Court. I'm Frank Lawrence, representing the Dry Creek Rancheria. With me is my associate, Brian Guth. I think the public policy is not a bad place to start here. The Supreme Court Cabazon case told us to look at the shorthand test to see whether there was state jurisdiction or not, was to look at the public policy of the state. That was before Congress enacted IGRA, Indian Gaming Regulatory Act, which comprehensively regulates the entire field of Indian gaming. But even before IGRA, the Supreme Court said, look at the public policy of the state. The State of California sat down and negotiated with Dry Creek, along with many other tribes, for a gaming compact that sets forth the allocation of jurisdiction for the complete regulation of tribal gaming facilities. That compact you have in the record lays out a comprehensive scheme for applying all the uniform codes that need to apply to build a big, safe, public building. They knew they were talking about a casino. The state negotiated for those standards. The tribe has applied those standards. The compact is very clear that the tribe has to adopt the standards of the uniform building, fire, electrical, mechanical, plumbing, and other related codes. Those uniform codes assure safety in a building when complied with. The compact lays out the standards. Breyer. They don't assure safety because we still have fires and so forth. That's correct, Your Honor. There's no perfect guarantee. But they do set a standard that is accepted nationally. California has adopted the UBC and UFC, the California Code, with some amendments, which the county has adopted as well with its amendments. It sets a standard so that when we the issue of mutual aid agreements was mentioned briefly. The reason that one fire department can enter a mutual aid agreement and go to another jurisdiction where it does not have code enforcement authority or inspection authority and know its firefighters will be safe, that their hoses will fit the fire hydrants and so forth, is because there are these uniform standards. Those standards are applied by the state and the tribe by agreement on the reservation. The compact gives inspection authority explicitly to the tribal gaming agency's qualified official. It gives oversight inspection rights to the State of California with a dispute resolution mechanism, including waivers of sovereign immunity if it needs to go that far to resolve any disputes. Can you respond to the point of opposing counsel that in order to know how to fight a fire, they need to know the premises? Yes, I think that's an excellent point. It's somewhat misleading, the record in this case. County Fire Chief Vern Losh does not fight fires. He does not have a fire department with trucks and firefighters. He does not respond to fires. There's no evidence in the record that he does. It is my belief he does not. He deals with code inspections. He deals with hazardous materials and coordination countywide among various fire departments. The people who fight the fires are the Geyserville Fire Protection District and, excuse me, and the MOU between the tribe and Geyserville has always responded to all emergencies on the reservation from its inception because it's close by and they've always done so. Before the MOU, the MOU codified the relationship and provided a funding mechanism from the tribe to Geyserville to enable Geyserville to upgrade its equipment and training and so forth. It's in the record at 239, and I just wanted to draw your attention specifically to paragraph 4.1. In order to protect, and I'm quoting now, in order to protect the safety of fire personnel and the patrons and employees of the project, the tribe shall provide at least reasonable access to the project to the fire district so the fire district may examine the project. Pursuant to these examinations, the fire district shall make recommendations to the tribe regarding maintaining or improving the safety of the project and the rancheria. There's dispute resolution. Geyserville can walk away if it doesn't feel comfortable, and the record is very clear in Leon Manuel's declarations that Geyserville participated over many years in the design and construction of the facility. They were on site.  So there's been a very close cooperative relationship. Well, what about Mr. Dionne's point that Sonoma had to respond to a recent hazardous materials incident? Well, there are mutual aid agreements that Geyserville has with other public entities, and I'm not aware of any hazardous materials incident at the casino. I think Mr. Dionne said it turned out to be a false alarm. But Geyserville, in the MOU with the tribe, makes reference to the fact that if Geyserville needs backup, it has other MOUs with other fire departments, such as Healdsburg City, Santa Rosa City, and so on, that it can call on. How do those? That's no different than the city of Santa Rosa having a mutual aid agreement with the city of Healdsburg to help each other out if they need backup. The Healdsburg police chief would never go into Santa Rosa and say, I have code enforcement authority in Santa Rosa, and I want to apply Healdsburg's municipal fire code in the city of Santa Rosa. That would make no sense. That's what the county fire chief is trying to do here. I wanted to just correct a misapprehension in the county's reply brief. In looking at the issue of the scope of the Indian Gaming Regulatory Act, its preemptive scope, the county asserts in its reply brief that the language in the compact regarding protection of public safety does not apply to Class III gaming operations. And that is just not true. What IGRA says is in the section on Class II, tribe has to have a gaming ordinance, the ordinance that gets reviewed and approved by the federal government.  One of those is to provide that the construction and maintenance of a gaming facility and the operation of that gaming is conducted in a manner which adequately protects the environment and the public health and safety. And the reply brief says that only applies to Class II. It's not true. 2710 D1A Promenade 2 makes all of those requirements applicable to Class III ordinances also. So that same legal requirement under IGRA applies to Dry Creek's facility, the Class III facility under IGRA. The National Indian Gaming Commission has enforcement authority. We have a declaration from the California Regional Director, Gregory Bergfeld. It's at 329 through 31 in the record. He read about Vern Losh's comments in the Press Democrat and went out and did an inspection and under this federal statutory authority found that all the allegations of a lack of safety were untrue and that the casino was safe and met all the applicable codes. And that's in the record. Counsel mentioned People v. Rhodes. I'll just note Rhodes was a 1970 state case. The case does not discuss the question of whether the state statute is regulatory, civil regulatory or not. It predated the Cabazon decision which really solidified the civil regulatory criminal prohibitory distinction. That was in 87, so 17 years pre-Cabazon. The opinion in Rhodes acknowledges that the state regulation at issue was regulatory. And just as background for wildland firefighting, which is what that case related to, the Bureau of Indian Affairs has a contract with California Department of Fire to fight fire, wildland fires in Indian Country throughout the State of California. So that issue is, in our view, it's just not applicable. I wanted to reiterate, this Court in the Santa Rosa Band case 30 years ago said, Subjecting the reservation to local jurisdiction would dilute, if not altogether eliminate, Indian political control of the timing and the scope of development of reservation resources. Subjecting Indian economic development to the veto power of potentially hostile local non-Indian majorities. I could have written that sentence about this case. That's what this case is about. And in the opening brief, the County Fire Chief, trying to make the point that the United States is not a necessary and indispensable party, says, Neither the inspection warrant nor the requirement of a second access road would place any obligations on the U.S. That's on page 33. There is no doubt that this dispute, which arose right at the opening of the casino, was all about the interests that were allowed and opposed an Indian casino being opened in Sonoma County's beautiful Alexander Valley Highway 128 wine region. And there is no doubt in the tribe's mind that's exactly what's at issue. And it would certainly put burdens on the United States of America. They would be responsible under about 800 or 900 regulations in 25 CFR Part 170 dealing with Indian reservation roads to finance the construction of the new road that would have to be built. So that is somewhat of a misconception, I think, on the county's part. Excuse me. On the Rule 19 issue, if the United States, if that road was deemed not to be held in trust, would the county have any inspection authorization rights over that road? Well, Your Honor, for that to be deemed not in trust, the county would need to bring a quiet title action against the United States. There's no question the United States holds title to the easement. That's undisputed. And this court has decided, and Judge Clifton was on that panel, in the case that the neighbors brought to try to restrict access on that BIA 93 easement road onto the reservation. And that case was properly dismissed because the Quiet Title Act does not waive the government's immunity, federal government's immunity, for quiet title actions that relate to Indian lands or lands that the federal government makes a colorable claim to be Indian lands. That's the end of the inquiry. So your question presumes that Congress amends the Quiet Title Act and allows those actions to be brought for Indian lands. Then if it were, if the United States owned it but not in trust for the tribe, would the county have jurisdiction? I don't think so. I don't think the county, if the federal government owns land that's not in trust for a tribe and happens to have a U.S. Army base on it, I don't think the local county officials have jurisdiction to impose county laws on federal lands. I was a little, I had a question about the Rule 19 ruling because the court had already said that PL 280 didn't apply. And it didn't seem to me, regardless of how the district court came out, that it would make any difference to the United States' interests. It wasn't clear to me why the United States was an indispensable party in that circumstance. I'm not sure I understand your question. In other words, if the United States was holding the road in trust, then Sonoma County had no ability to inspect it. The court had already decided that under Public Law 280, the state fire codes were regulatory. And if the United States held it in fee, not in trust, then the county would have no rights to inspect that road. So why did it make any difference if the United States was a party or not? Well, under that scenario, I'm not sure it would make a difference. Although, I'm not sure the district court said if it determined the land was in fee that there still would be no state jurisdiction. If it's in fee, if it's not Indian lands, then Public Law 280 is irrelevant. And it's just a question of what control does the United States have over its property as against a county that's contiguous. I'm not sure that's the case. Suppose, for example, you had a – we're jumping out of the facts of this case. You've got a criminal – a criminal provision which could be applicable to tribal property. You've still got the problem of is the United States an indispensable party, because the property is nominally held by the United States as the titleholder. Well, Your Honor, a criminal case would involve an individual Indian presumably living on a reservation. I'm sorry. I didn't make myself clear. Suppose you've got a kind of code that is criminal in nature. So the issue becomes the applicability of a state code, a fireworks provision, for example. And it's deemed, yes, this is applicable to Indian territory. Now, how you get the inspection issue, I guess I'm not sure. But I'm just wondering, it seems to me this United States as indispensable party problem is a broader one with regard to tribal property in general. Well, the facts of the – I think I understand your question. And I think as to a fireworks stand, there would be no particular interest the United States would have in a fireworks stand on the reservation, per se. We're talking about a BIA Indian. Can someone proceed without them? I'm not disputing. I think so. Yes. A criminal case against the Sunder Kashan, a criminal case against the, you know, whatever they were, Class C fireworks, the big ones. I think that certainly could proceed in the absence of the United States. What we're talking about is a BIA reservation road owned by the United States, designed, built, constructed, maintained by the United States with federal dollars that provides the one and only access to the tribe's reservation, which really implicates the government's trust obligations to the tribe. If you cut that road off, that reservation is landlocked, as it was from 1915 to 1965. BIA officials and tribal members alike had to trespass, essentially, with implied consent, I suppose, to get to the reservation for the first half century of its existence. BIA has a very strong interest in that road for all of those reasons. And if it was required to build a second road, the government would be very likely to be liable for the cost of that second road, which, given the topography, would be very expensive. And, you know, the government has a lot of interests that relate to these facts that might not relate to the hypothetically opposed. If there are no other questions, I'd be happy to submit. Thank you. Mr. Dionne. Thank you, Your Honor. Just a quick few points here. First, just in regards to the fire department, the Sonoma County Fire Chief and the fire officials, we do have fire trucks. We do respond to fires, especially like wildland fires. There was a major fire in Sonoma County a couple of years back. Our fire chiefs do have fire trucks and respond to those. In regards to IGRA, I think that if you take a look at the — I think it's the Solette Indian Tribe v. State of Oregon case we cited in our brief. They talk about the scope of IGRA and its preemption effect. And the court said IGRA deals with, in the Ninth Circuit case, deals with Indian gaming. And that's not what we're talking about here. We're talking about fire safety. Getting then to the Rule 19 issue and the indispensable party, I think, Justice Sercutti, you raised a good issue, which is the district court said public law 280 doesn't apply. So that issue is not — you don't need to look at that anymore. Is the United States really an indispensable party? And I would say no, they're not an indispensable party. They may have been a necessary party, but they're not indispensable for the purpose of doing an inspection on BIA 93. And then lastly, just in regards to the casino itself and opening on — I think it was mid-September of 2002 and having an inspection two days before, Mr. Lawrence seems to imply that the whole purpose behind this is that we're trying to close down the casino and that we're trying to close down the road. And that's not the case. The fact of the matter is the tribe never invited the fire chief up to the facility to inspect until literally two days before the casinos to open. And that's when we see these violations that we're concerned about. The other thing to realize is looking at the evidence in the record, the tribe, Leon Manuel submitted a declaration talking about all the things they've done since September 2002. So our position, the reason they've taken some of those steps is because we issued a notice of violation. We issued the citations. It's because of this lawsuit that have taken the steps to change some of the things they've done up there. And in regards to the road itself, the bought property, which happened since this case started, next door to the rancheria where they can build a second access road. So there are options out there, but I do think that the fire chief should have a minimum have the right to inspect the property to know what's up there and what they're going to face if they have a fire emergency. Thank you. Roberts. Thank you. Thank both counsel for your arguments. The case just argued is submitted.
judges: B. Fletcher, Clifton, Ikuta